**Application of ROSS DEVELOPMENT CO., Inc.**

Bankr. No. 49076.

United States District Court
E. D. New York.
Feb. 7, 1952.

754

Samuel S. Bisgyer, Brooklyn, N. Y., trustee.

Max Schwartz, Brooklyn, N. Y., for the General Unsecured-Lien Creditors' Committee.

Norman Kemper, Brooklyn, N. Y., for claimant David Megur.

BYERS, District Judge.

These cross motions are addressed to the Referee's report of January 2, 1952, granting the petition of David Megur to follow into the funds of the debtor's estate in the trustee's hands and to impress a lien thereon, the sum of $6,100, representing $6,000 being a down payment on a contract of the debtor to convey certain real estate to be improved by the erection thereon of a one-family dwelling; plus $100 being "the reasonable expense for the examination of title to the said premises" under an appropriate provision of the contract. That item is not deemed to have been established by proof that the title was examined for the vendee.

The balance of the clause upon which petitioner relies is: "All sums paid on account of this contract and (as above quoted) are hereby made liens thereon (i. e., said premises), but such liens shall not continue after default by the purchaser under this contract." There was no such default.

The opposition of the trustee to the report and of the Committee of General Creditors, does not warrant the criticism voiced at argument; it is the duty of the trustee to advance every legal consideration that will test the soundness of the Referee's conclusions, in behalf of correct administration; and of course the General Creditors are necessarily alert to secure for themselves the greatest possible participation in the avails of the debtor's property.

The business of the debtor was to sell real estate, cf. D.C., 98 F.Supp. 872, and any plan must endeavor to effectuate that purpose, which means that sales made during administration assume the aspect of carrying on the debtor's business rather than liquidation as such.

The petitioner's Exhibit 1 is his contract of October 6, 1949. It could not be commended to law students for coherence, nor as an example of craftsmanship in the field of conveyancing; it is awkwardly and stumblingly sufficient, however, to expose with obvious diffidence, the purpose heretofore stated.

That purpose in turn will support the petitioner's asserted lien upon $6,000 now in the trustee's hands, unless the opposing arguments overcome the presumptive showing of validity.

Those contentions will be found to be:

1. Since the $6,000 was on account of the $34,000 named in the contract as constituting "the price for all the work included in this contract", it cannot be said to have been a down payment on the real estate itself as distinguished from so much of the entire sum as was intended to cover the cost of erecting the building; this being so, the lien, if any, would attach to after-acquired property, being the uncompleted residence which was on the property when sold at public sale by the trustee, and hence would be subordinate to the claims of general creditors; that to the extent that the lien is asserted against the said structure it "presents the aspect of a building loan and not having been filed * * * (Lien Law [McK.Consol.Laws, c. 33], Sec. 13, Sub. 2) it is subordinate to valid mechanic's liens against the premises".

It is true that the contract does not allocate part of the price to the land, and the balance to the contemplated building. This calculated duplicity was commented upon in the earlier opinion above cited, and its most flagrant manifestations have since led to successful criminal prosecutions in the County Court of Nassau County for grand larceny, against the two Rosses, and this debtor.

There is no apparent reason to construe the contract so as to avoid its common-sense purpose. It was made in October of 1949, and title was to pass in April of 1950; during the interval the property was to be improved by the erection of a dwelling so that on the closing date the vendor would convey and the vendee would receive title to land and building exactly as though the latter had been · in existence when the contract was signed.

Had the contract called for the clearing away of an existing structure, or ruins, so that a vacant parcel would ultimately be acquired by the vendee, a down payment would encounter no obstacle under the lien clause; it is the present belief that in principle the cases would be the same and that this petitioner's asserted lien is not to be avoided because the building was to be erected between the date of the contract and law day. Of course if no building had ever been started, the lien could have been asserted as to the full down payment; the partial erection of a residence did not change the basic relations of the vendor and vendee.

Moreover, when this public sale was had (in connection with several parcels containing houses in various stages of completion), the presence on this lot of a partially built house (i. e., one that was "all framed out; the studding was in; the roof was up, and it had tar paper covering") added an element of potential value to the property as a whole, and it fetched $9,300 (subject to the lien of a first mortgage), out of which releases from two other mortgage liens were to be deducted.

That public sale was intended to promote the ultimate interests of all creditors and is deemed to have done so, and the down payment made by this petitioner must have found its way in part into that partially completed structure which Green acquired.

The nature and status of a vendee's lien in New York is expounded in Elterman v. Hyman, 192 N.Y. 113, 84 N.E. 937; see also Interboro Operating Corp. v. Con. Sec. & Mortg. Corp., 269 N.Y. 56, 198 N.E. 665.

Megur sued the debtor for specific performance, having become convinced that the debtor was making default in the contract by failing to complete the house and make title on April 1, 1950; after fruitless interviews with one or both of the Rosses, he began the stated action on July 26, 1950, and filed in the County Clerk's Office of Nassau County a lis pendens (Pet.Ex.3) and his complaint.

The former is a notice of pendency of the action for specific performance (i. e., an action to recover judgment affecting the title to real property. Sec. 120, Civil Practice Act, refers to the said contract, and contains a description of the lot or parcel in question "with the buildings and improvements thereon".

This was two days over four months prior to the filing of the petition in this Chap. X Proceeding, 11 U.S.C.A. § 501 et seq., which occurred on November 28, 1950.

The legal effect of such a notice is prescribed in Sec. 121, C.P.A., which need not be quoted.

The lis pendens is criticised for failing to state "the object of the action", but that objection cannot prevail; the reference to the contract is clear and unmistakable, and as has been seen, one of its terms provided for the vendee's lien. The complaint seeks specific performance, and if good title cannot be made the defendants "be adjudged to pay the sum of $10,000.00 constituting plaintiff's deposit, interest, expenses, made and incurred under said agreement and damages suffered as aforesaid, and that said sums and costs of this action be declared a lien upon the said premises, and said lien foreclosed by a sale of said premises", etc. That was legally sufficient.

Metz v. Forest Hills Homes, 197 Misc. 968, 95 N.Y.S.2d 29 at page 32.

The action did not go to trial, but the lien was duly asserted as a matter of public record, and must be dealt with here on the merits, since it gave notice to creditors and was binding upon them, more than four months prior to the filing of the Chapter X petition. For present purposes the trustee's weapons of attack are no more potent than would have been the debtor's, if no petition had been filed.

This is the Referee's view and should prevail in the opinion of the Court.

A mortgagee with notice would be in the same position. Cassia Corp. v. North Hills Holding Corp., 278 App.Div. 960, 105 N.Y. S.2d 631.

■ It follows therefore that the Megur lien is not to be disposed of by the reasoning which would apply to a mortgage covering after-acquired personal property, the lien of which would take rank after others created without notice of it. Also it cannot be labeled as a building loan mortgage in substance or effect. The provisions of Section 13 of the Lien Law of New York dealing with the relative priorities of a mechanic's lien, and advances under such a building loan mortgage are not seen to have any bearing on the Megur contract.

The cases cited in the brief filed for the General Creditors Committee have not been overlooked. None deals with a lien asserted in connection with a lis pendens filed more than four months prior to the petition in bankruptcy. It does not affect the question here to demonstrate that a lien "endured" by a bankrupt while insolvent, Warner v. Dworsky, D.C., 91 F.Supp. 884, can constitute a voidable preference.

■ 2. The next contention of the trustee and of the General Creditors Committee is based upon the uncontroverted fact that, in order to accomplish the public sale in question, release clauses contained in blanket second and third mortgages were not enforced, and that $1,500 as to the former instead of $4,000, and $750 as to the latter instead of $2,000, were arranged for by the trustee with the respective mortgagees. This was done to facilitate the sale of so much of the debtor's real estate as had been delimited on a filed map with streets properly laid down and physically opened; the sale was accomplished and several titles were eventually closed as to all parcels so designated.

It must be evident that such a sale and the completion of several then unfinished houses, and the subsequent erection of wholly new ones on unimproved parcels comprehended in the sale, were calculated to impart value to the remaining unmapped portion of the debtor's real estate, and to stimulate a market for it. Thus far, however, that part of the property has not been the subject of such an offer as could command the Court's approval.

The argument is made that, since the sale yielded—as to the Megur property— a total of $2,250 applied to releases, instead of $6,000 as the mortgages provided, the difference of $3,750 still remains unpaid thereon, and that thus the liens thereof upon the property not contracted to be sold to Megur have been increased by that amount, and hence it is inequitable that the Megur lien should attach to the funds in the trustee's hands, to the full extent of $6,000.

Another way of stating the contention is that Megur should not stand in any better position than he would have in the absence of the special agreements for release; that he should be dealt with as though $3,750 of the sum bidden by Green had been turned over to the second and third mortgages, in addition to the said $2,250. Since that did not take place, no valuable conclusion can result from acting as though it had.

The release terms were uniform as to all parcels disposed of at the public sale, and no objection was stated by the General Creditors when the terms were made known, such as now are urged in opposition to the report of the Referee.

The reasoning above related cannot be refuted so far as mathematics are concerned, but it fails to take into account the desire expressed by practically all creditors, secured and unsecured, in March of 1951, to sell as much of the debtor's property as possible in order to stop the running of

 

mortgage interest and arrears of taxes, and thus to hasten the day when something could be realized from what was then unproductive real estate that was consuming itself. Thus the skill of the trustee, in perfecting arrangements whereby substantial progress in that behalf could be brought to pass, was broadly acclaimed.

The General Creditors Committee joined in the application to confirm the several sales, and it is now too late in the day to recede from that position.

If the General Creditors shall be adversely affected by this view of the impact of the mortgage liens as distinguished from the amount of the mortgage debts remaining unpaid (which the Court takes the liberty of doubting), that result must be treated as part of the price that had to be paid in order to hasten the numerous sales that resulted from the skill brought to bear by the trustee in the negotiations leading up to the public offering.

It does not change this aspect of the situation to urge that the trustee is subrogated to the rights of the second and third mortgagees with respect to the unpaid amounts of the original sums payable for releases.

No such reservation was stated in the record or elsewhere at the time when the proposed sale was under consideration for sanction, or later for confirmation. When the attorney representing Megur stated his intention to oppose the sale, and was asked to defer objection until the bidding should close, and thereafter when it did close and approval was sought of the sale to Green, no suggestion from any source was forthcoming to the general effect which is now being urged. In view of these happenings, it is the conclusion of this Court that Megur was justified in believing that the sum realized—$9,300 over the first mortgage—was understood to be sufficient and more, to induce him to look to it and not to the property itself for the satisfaction of his asserted lien, and he was thereby induced not to pursue his contemplated objection.

If the subrogation theory be pursued, its destination disappears in the process, since the acceptance by the second and third mortgagees of less than the stipulated sums for releases, created no rights against the remaining property which were not already in existence, both mortgages being of blanket coverage.

Under these circumstances, if the Court is to be fair, the mathematics of the situation must yield to its manifest equities. Since Megur is the only vendee who sought to litigate his lien prior to the four month period, his status is not to be confused with other vendee lienors.

As to the lien of the "Con-Air Corp", the finding of the Referee as to amount is not criticised, but the direction to pay is set aside in view of the ex parte nature of this finding.

As stated at the outset, the $100 included in the Megur lien is not established by the testimony as coming within the lien clause of the Megur contract, and it is disallowed.

Except as indicated, the motion to confirm the Referee's report is granted.

Settle order.